## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **SHARON L. DANQUAH,** *et al.***,**<br><br>**Plaintiffs,**<br><br>**v.**<br><br>**UNIVERSITY OF MEDICINE AND DENTISTRY OF NEW JERSEY,** *et al.***,**<br><br>**Defendants.** | **Civil Action No.: 2:11-cv-06377-JLL-MAH**<br><br><u>**Document Electronically Filed**</u><br><br><u>**RETURN DATE: December 5, 2011**</u> |

---

## DEFENDANTS' BRIEF IN OPPOSITION TO PLAINTIFFS' APPLICATION FOR PRELIMINARY INJUNCTIVE RELIEF

---

**McELROY, DEUTSCH, MULVANEY & CARPENTER, LLP**
**1300 Mt. Kemble Avenue**
**P.O. Box 2075**
**Morristown, New Jersey 07960**
**(973) 993-8100**

*Attorneys for Defendants*

# **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ........................................................................... iii

PRELIMINARY STATEMENT ..................................................................... 1

STATEMENT OF FACTS.............................................................................. 5

ARGUMENT

      PLAINTIFFS HAVE FAILED TO DEMONSTRATE THEIR
      ENTITLEMENT TO THE EXTRAORDINARY REMEDY
      OF A PRELIMINARY INJUNCTION............................................... 17

          A.   Plaintiffs Cannot Demonstrate a Substantial Likelihood
               of Success on the Merits ................................................. 18

               1.   Church Amendment Claims...................................... 19

                        a)   There is No Private Right of Action Under the
                              Church Amendment ....................................... 19

                        b)   Even Assuming *Arguendo* that Plaintiffs Could
                              Pursue Remedies for Alleged Violations of the
                              Church Amendment Directly Under That Statute
                              or Through Section 1983, They Cannot Show a
                              Substantial Likelihood of Success on the Merits
                              of Such Claims Because, *Inter Alia*, They Are
                              Not Required to Assist in the Performance of
                              Abortions...................................................... 24

               2.   Constitutional Claims............................................. 35

                        a)   The Court Should Not Address the Constitutional
                                Claim Because Plaintiffs Have Failed to Pursue
                                Available Procedures That Would Avoid Any
                                Alleged Deprivation of Constitutional Rights............... 36

i

          b)    Plaintiff's Constitutional Claims are Deficient
As a Matter of Law .......................................................... 37

      3.    New Jersey Conscience Statute Claims ................................. 43

B.    Plaintiffs Cannot Demonstrate That They Will Suffer
Irreparable Harm if Their Request for A Preliminary
Injunction is Denied ........................................................ 45

C.    Plaintiffs Cannot Demonstrate That the Balance of Hardships
Weighs in Their Favor .................................................... 48

D.    Plaintiffs Cannot Demonstrate That an Injunction Would
Serve the Public Interest ................................................. 49

CONCLUSION ........................................................................... 50

# <u>TABLE OF AUTHORITIES</u>

<u>Page</u>

<u>Cases</u>

*Abigail Alliance for Better Access to Developmental Drugs v. Eschenbach*,
    495 F.3d 695 (D.C. Cir. 2007) ..................................................................... 39

*Acevedo v. City of Philadelphia*,
    680 F. Supp. 2d 716 (E.D. Pa. 2010) ........................................................... 36

*Alexander v. Sandoval*,
    532 U.S. 275 (2001) ..................................................................................... 21

*Alvin v. Suzuki*,
    227 F.3d 107 (3d Cir. 2000)......................................................................... 36

*American Home Prods. Corp. v. Proctor & Gamble, Co.*,
    871 F. Supp. 739 (D.N.J. 1994) ................................................................... 18

*Anspach v. City of Philadelphia*,
    630 F. Supp. 2d 488 (E.D. Pa. Oct 29, 2008), *aff'd*,
    380 Fed. Appx. 180 (3d Cir. 2010) .................................................. 19, 22, 23

*Armstrong World Industries, Inc. v. Adams*,
    961 F.2d 405 (3d Cir. 1992)......................................................................... 36

*California v. United States*,
    2008 WL 744840 (N.D. Cal., Mar. 18, 2008)........................................ 31, 32

*Carey v. Maricopa County*,
    609 F. Supp. 2d 1132 (D. Ariz. 2009).......................................................... 20

*Cenzon-DeCarlo v. Mount Sinai Hosp.*,
    626 F.3d 695 (2nd Cir. 2010)............................................................... *passim*

*City of Boerne v. Flores*,
    521 U.S. 507 (1997) ..................................................................................... 35

*Collins v. Harker Heights*,
  503 U.S. 115 (1992) ................................................................... 38

*Cont'l Group, Inc. v. Amoco Chem. Corp.*,
  614 F.2d 351 (3d Cir. 1980) ....................................................... 47

*Doe v. Bridgeton Hospital Ass'n, Inc.*,
  71 N.J. 478 (1976) ............................................................... 44, 45

*ECRI v. McGraw-Hill, Inc.*,
  809 F.2d 223 (3d Cir. 1987) ....................................................... 47

*Employment Division, Department of Human Resources of Oregon v. Smith*,
  494 U.S. 872 (1990) ................................................................... 35

*Erzinger v. Regents of Univ. of Cal.*,
  137 Cal. App. 3d 389 (1982) ....................................................... 20

*Garcetti v. Ceballos*,
  547 U.S. 410 (2006) ................................................................... 40

*Gonzaga University v. Doe*,
  536 U.S. 273 (2002) ....................................................... 21, 22, 23

*Instant Air Freight Co. v. C.F. Air Freight Co.*,
  882 F.2d 797 (3d Cir. 1989) ....................................................... 18

*McCurdy v. Dodd*,
  352 F.3d 820 (3d Cir. 2003) ................................................... 39, 41

*McGovern v. City of Jersey City*,
  2006 WL 42236 (D.N.J. 2006) ................................................. 42, 43

*Mills v. Rogers*,
  457 U.S. 291 (1982) ................................................................... 36

*Moncivaiz v. DeKalb County*,
  2004 WL 539994 (N.D. Ill. Mar.12, 2004) ............................... 19, 20

*Nead v. Bd. of Trustees of Eastern Illinois Univ.*,
   2006 WL 1582454 (C.D. Ill. June 6, 2006) ................................................. 19

*New Jersey Payphone Assoc. v. Town of West New York*,
   299 F.3d 235 (3d Cir. 2002)........................................................................... 36

*Nicholas v. Pennsylvania State University*,
   227 F.3d 133 (3d Cir. 2000).......................................................................... 42

*Planned Parenthood of Central Texas v. Sanchez*,
   280 F. Supp. 2d 590 (W.D. Tex. 2003), *remanded*,
   403 F.3d 324 (5th Cir. 2005)........................................................................ 23

*Planned Parenthood of Pennsylvania v. Casey*,
   505 U.S. 833 (1992) ................................................................................ 39, 49

*Roe v. Wade*,
   400 U.S. 113 (1973) ................................................................................ 38, 49

*Schmidt v. Des Moines Public Schools*,
   655 F.3d 811 (8th Cir. 2011).......................................................................... 39

*Shelton v. University of Medicine & Dentistry of New Jersey*,
   223 F.3d 220 (3d Cir. 2000)............................................................... 32, 33, 44

*Shire US Inc., v. Barr Labs. Inc.*,
   329 F.3d 348 (3d Cir. 2003)........................................................................... 18

*Singleton v. Cecil*,
   176 F.3d 419 (8th Cir. 1999).......................................................................... 42

*Three Rivers Ctr. for Indep. Living v. Hous. Auth. of the City of Pittsburgh*,
   382 F.3d 412 (3d Cir. 2004)........................................................................... 22

*United States v. Lee*,
   455 U.S. 252 (1982) ...................................................................................... 35

*Warner Bros. Pictures, Inc. v. Gittone*,
   110 F.2d 292 (3d Cir. 1940)........................................................................... 17

*Washington v. Glucksberg*,
    521 U.S. 702 (1997) ............................................................................... 38, 41

<u>Statutes</u>

28 U.S.C. § 1367 ................................................................................................ 43

42 U.S.C. § 300 ................................................................................................ 22

42 U.S.C. § 300a-7 ..................................................................................... *passim*

42 U.S.C. § 1395dd .................................................................................... 31, 32

42 U.S.C. § 1983 ......................................................................................... *passim*

N.J.S.A. § 2A:65A-1 .................................................................................. *passim*

N.J.S.A. 18A:64G-3 .......................................................................................... 5

Protect Life Act, H.R. 358, 112th Cong. § 2(g)(2011) ........................................... 20

Pub. L. No. 93-348, 88 Stat 342 (1974) ..................................................... 21

Pub. L. No. 108-447, 118 Stat. 2809 (2004) ..................................................... 31, 32

<u>Regulations</u>

Ensuring That Department of Health and Human Services Funds
    Do Not Support Coercive or Discriminatory Policies or Practices
    in Violation of Federal Law,
    73 Fed. Reg. 78072 (Dec. 19, 2008) ................................................................ 27

Regulation for the Enforcement of Federal Health Care Provider
    Conscience Protection Laws,
    76 Fed. Reg. 9968-02 (Feb. 23, 2011) ..................................................... 27, 28, 29

45 C.F.R. § 88.1 ................................................................................................ 27

45 C.F.R. § 88.2 ................................................................................................ 23

<u>Other Authorities</u>

American Nurses Association Position Statement: Reproductive Health
(Mar. 27 2010) ........................................................................................ 33

Rohit Talwar, *The Dangers of Broad Federal Conscience Law*,
 6 Health Law. 23 (2009) ....................................................................... 29

Ronald A. Lindsay, *When to Grant Conscientious Objector Status,*
 7:6 Am. J. of  Bioethics 25, 26 (2007) ............................................   29

Seth Augenstein, *Nurses' abortion suit asks: At what point is assisting
 facilitating?,*
  THE STAR LEDGER, Nov. 15, 2011 ...................................................... 27

## PRELIMINARY STATEMENT

This matter is nothing more than a vehicle to promote the anti-abortion political agenda of the Alliance Defense Fund ("ADF").  That agenda clearly is broader than any concern about the 12 plaintiffs – nurses working at University of Medicine and Dentistry of New Jersey's ("UMDNJ") University Hospital who, despite the inflammatory rhetoric contained in the ADF's Complaint, Preliminary Injunction motion papers and recent press statements, are **not** required by UMDNJ or the other named defendants ("defendants") to assist in the performance of abortions.  Rather, plaintiffs are expected to provide termination of pregnancy ("TOP") patients with the same routine pre-operative and post-operative care that is provided to all patients in the Hospital's Same Day Services ("SDS") Unit, such as taking the patients' vital signs and medical history, and providing post-operative pain medications.

Plaintiffs are unable to show a substantial likelihood of success on the merits of their statutory and Constitutional claims, which they must in order to obtain the extraordinary remedy of a preliminary injunction.  The ADF seeks to have this Court act in a legislative capacity and declare that there is a private right of action under the federal Church Amendment, a statute which confers no such express or implied right of action.  The ADF cannot circumvent this fact by disguising their Church Amendment claim as a Section 1983 claim, since the Church Amendment

1

does not unambiguously confer individual rights that can be enforced through Section 1983.  The ADF also seeks to have this Court apply the New Jersey Conscience statute to UMDNJ despite clear case law holding that the statute is inapplicable to public hospitals such as University Hospital.  Finally, the ADF seeks to have this Court create new Constitutional law by declaring that plaintiffs have a previously unrecognized due process liberty interest in continuing public employment after refusing to provide any care whatsoever to TOP patients, including emergency care.

Even assuming *arguendo* that the Church Amendment provided a private right of action and the New Jersey Conscience statute applied to UMDNJ, the statutes' intended purposes are not as broad as plaintiffs claim.  Through these legal proceedings, plaintiffs seek to be relieved from having to provide TOP patients with <u>any</u> pre or post-operative care.  Again, the routine, peripheral care that plaintiffs are now expected to provide to TOP patients is the same care they provide to other SDS patients, and cannot reasonably be construed as assisting in the performance of abortions.  Significantly, plaintiffs do not object to providing this same routine care to other SDS patients.  Plaintiffs' demand to be excused from this routine care does not fall within the protection of the Church Amendment or the New Jersey Conscience statute, as it crosses the line from the right to refuse

to assist in the performance of abortions to boycotting the care of certain patients based on their status as TOP patients.

Plaintiffs also seek relief from having to provide care to TOP patients in the event of a medical emergency (which they are expected to do if no non-objecting medical personnel are available to assist). However, a reasonable interpretation of the statutes at issue requires that their provisions be harmonized with the Hospital's obligation to provide emergency care in a neutral fashion. In order to completely protect plaintiffs from the possibility of having to provide such emergency care, UMDNJ would have to transfer them to another department that does not treat TOP patients. Such a transfer (which, in the past, plaintiffs adamantly refused to even discuss)[1] would avoid the risk of <u>any</u> harm to plaintiffs. Because there is a reasonable avenue for avoiding such harm, plaintiffs should not be awarded the extraordinary remedy of a preliminary injunction.

Similarly, there is no substantial likelihood that plaintiffs' constitutional claims will be successful. The claims are not ripe and the constitutional issue may be avoided entirely by the reasonable accommodation process. Moreover, the

---

[1] Indeed, on November 19, 2011, plaintiffs' attorneys filed an application for a Temporary Restraining Order to enjoin defendants from discussing potential accommodations with plaintiffs. This Court denied that application by Order dated November 22, 2011. As a result, nine of the twelve plaintiffs indicated today (November 22, 2011) that they are willing to meet with UMDNJ to discuss potential accommodations.

claims fail on their merits because there is no liberty interest protected by substantive due process that guarantees continued public employment without discrimination to nurses who refuse to provide any care to abortion patients.

Plaintiffs' request for a preliminary injunction also must be denied because they cannot demonstrate that they will be irreparably harmed if their request is not granted. As noted above, plaintiffs could avoid any harm – let alone irreparable harm – by accepting a reasonable accommodation (which may be a transfer to a Hospital Unit where they will have no interaction with TOP patients). Even if plaintiffs were to remain in the SDS Unit, again, they are not forced and will not be forced to assist in the performance of abortions. Certainly, it is not reasonable to suggest that plaintiffs will suffer irreparable emotional harm from being expected to engage in peripheral tasks such as, for example, taking TOP patients' blood pressure, recording their medical histories, and ensuring that they have rides home; these are tasks that they regularly perform for other patients (and have performed in the past for TOP patients) without objection and, presumably, without experiencing any emotional distress. The risk that plaintiffs will have to assist a TOP patient in an emergency situation (because no non-objecting nurses are available to assist) is too speculative to support the issuance of a preliminary injunction.

Nor can plaintiffs demonstrate that the balance of hardships among the parties weighs in their favor, as they must in order to obtain a preliminary injunction.  Until today plaintiffs refused to explore any accommodations of their religious and/or moral objections; if following discussions with UMDNJ they refuse to accept reasonable accommodations that are offered, then any harm they suffer if their request for an injunction is denied will be self-induced.  However, if the injunction plaintiffs seek is granted, such will have significant consequences to the effective and cost efficient operation of the Hospital.

Finally, plaintiffs' request for an injunction must be denied because they cannot show that such an injunction would benefit the public.  Indeed, it would harm the public, as it would undermine the Hospital's ability to guarantee that TOP patients will be assigned nurses who will care for them in the event of an emergency and will place a substantial obstacle in the path of women seeking to obtain safe termination of pregnancy procedures at University Hospital.

For these reasons, and as further demonstrated herein, plaintiffs' requests for a preliminary injunction must be denied.

## STATEMENT OF FACTS

UMDNJ is a body corporate and politic that operates "programs of medical, dental, nursing and health related professions and health sciences education." *N.J.S.A.* 18A:64G-3.  University Hospital, a component of UMDNJ, is a public

hospital that provides a comprehensive array of inpatient and outpatient medical services.[2]

Plaintiffs are employed as nurses in the Hospital's SDS Unit.   This Unit operates, in general, five days per week, from 5:30 a.m. to 11:30 p.m. each day (Affidavit of Tammy Ludwig ("Ludwig Aff."), ¶ 6).[3]   The Unit provides services to a total of approximately 150 patients per week (*Id.*).   Approximately eighty-five percent of the services provided by the Unit involve the pre and post-operative care of surgical patients (*Id.*).   The surgical patients are patients who are scheduled for all types of surgery, including dental surgery, orthopedic surgery, cardiovascular surgery, urological surgery, plastic surgery, gall bladder, liver, and kidney surgery, and gynecological surgery, including but not limited to abortion, which is referred to as termination of pregnancy (*Id.*).   Approximately fifteen percent of the services provided by the Unit involve the pre and post-procedural care of patients who are undergoing non-surgical procedures such as blood transfusions, biopsies, and

---

[2] Along with UMDNJ, plaintiffs have named UMDNJ's Board of Trustees, James Gonzalez (Acting President and CEO of University Hospital), Suzanne Atkin (the Hospital's Chief Medical Officer), Michael Jaker (Associate Professor of Medicine and Co-Chair of the UMDNJ-UH Bioethics Committee), Patricia Murphy (the Hospital's Supervising Advanced Practice Nurse), Theresa Rejrat (the Hospital's Chief Nursing Officer), Phyllis Liptack (the Hospital's Director of Perioperative Services), Magale Arriaga (the Hospital's SDS Nurse Manager) and Tammy Ludwig (an Assistant Nurse Manager in the Hospital's SDS and Post-Anesthesia Care Units) as defendants in this matter.

[3] Together with the SDS Nurse Manager (Magale Arriaga) and the other Assistant Nurse Manager (Cynthia Odeh), Ms. Ludwig is responsible for supervising the work of the nurses in the SDS Unit, including the plaintiffs in this matter (*Id.*, ¶4).

colonoscopies (*Id.*).   On average, the Unit provides services to approximately fifteen TOP patients per week (*Id.*, ¶7).[4]

There currently are sixteen staff nurses in the Unit.  Fourteen, including plaintiffs, are full-time; two are part-time (Ludwig Aff., ¶8).  The nurses work in a variety of shifts (*Id.*).  In addition to the staff nurses, the Unit occasionally uses *per-diem* nurses as needed to fill scheduling needs (*Id.*).

Unit nurses provide general pre-operative and post-operative care to all surgical patients who come through the Unit (Ludwig Aff., ¶9).  Unit nurses do not assist in surgery or go into the operating room for any surgery (*Id.*).

The duties and responsibilities of SDS Unit nurses with respect to surgical patients include general pre-operative care such as: having the patient change into a gown; checking to be sure the patient has a ride home; completing a nursing assessment forms; checking to see if the patient has any pre-existing medical conditions; checking the patient's physical condition (*e.g.*, level of pain, bleeding (if any), presence of nausea or vomiting); assessing skin integrity; reading charts; drawing blood if necessary; inserting and administering IVs; administering pain medication or antibiotics if needed; contacting the physician in the event of an

---

[4] The SDS Unit has provided pre and post-operative care to TOP patients since approximately 2000 (Affidavit of Theresa Rejrat ("Rejrat Aff."), ¶8).  Such care was being provided to TOP patients at the time each of the plaintiffs began working in the Unit (*Id.*).

emergency; and, in gynecological cases, determining if the patient has been treated for any sexually transmitted diseases (Ludwig Aff., ¶10).

The duties and responsibilities of Unit nurses with respect to surgical patients also include general post-operative care such as: evaluating post-operative pain and bleeding; ensuring the patient is able to eat and drink without vomiting; ensuring the patient can void without difficulty; ensuring adequate recovery from anesthesia; removal of the IV; returning personal belongings to the patient; ensuring the patient has a ride home; and reviewing discharge instructions and arranging for follow-up appointments (Ludwig Aff., ¶11).

The general pre-operative and post-operative duties identified in the preceding paragraphs apply to all surgical patients who come to the Unit (Ludwig Aff., ¶12). The Hospital does not discriminate against certain categories of surgical patients (*Id.*). None of the duties discussed above applies only or primarily to TOP patients (*Id.*). Unit nurses are expected to perform all of these duties for all surgical patients (*Id.*).[5]

---

[5] There is one pre-operative procedure that is unique to TOP patients. Approximately, two to four TOP patients per week are patients who have been treated with a laminaria (Ludwig Aff., ¶14). A laminaria is a tampon-like device which is inserted into the patient's cervix in a clinic or doctor's office prior to the time the patient comes to the SDS Unit (*Id.*). As part of the pre-operation procedures in the Unit, a physician removes the laminaria (*Id.*). A Unit nurse is required to be in the room when the laminaria is removed consistent with accepted standards of care (*Id.*). The nurse does not assist in the physical removal of the laminaria (*Id.*). After the laminaria is removed, the patient is brought to the

Unit nurses do not administer any termination of pregnancy-inducing drugs such as Cytotec pills (Ludwig Aff., ¶13).  These drugs are prescribed and taken in almost all instances before the patient arrives at the Unit (*Id.*).   In the unusual circumstance that a patient has not taken the pill prior to arriving at the Unit, the physician is called to give the pill to the patient (*Id.*).  Unit nurses are not required to give the pill to the patient (*Id.*).

All terminations of pregnancies are performed in the operating room by a physician (Ludwig Aff., ¶15).  Unit nurses are not present and do not at any time go into the operating room for these or other surgical procedures (*Id.*).  Products of conception are removed in the operating room by the doctor (*Id.*).

In March 2011, Unit Nurse Manager Magale Arriaga directed that changes be made in the assignments of Unit nurses (Affidavit of Magale Arriaga ("Arriaga Aff."), ¶6).   The changes were intended to stop the segmentation of duties in the Unit that had occurred over time (*Id.*).  Some Unit nurses had concentrated on certain duties only and, as a result, the Unit lacked an acceptable ability to provide coverage in all necessary areas (*Id.*).  For example, certain nurses had worked primarily at the front desk checking in and assisting patients, and had not worked much on the floor providing services; others had not been involved in making pre

operating room where the termination of pregnancy is performed by the physician (*Id.*).  Again, SDS Unit nurses do not go into to the operating room and do not assist with the surgical procedure (*Id.*, ¶9).

and post-operative telephone calls to patients; others had not performed chart audits which involved important review of records after the patient's treatment had been completed; others had not provided care to TOP patients (*Id.*).  Ms. Arriaga decided that all Unit nurses would rotate through all of these areas (*Id.*).  Additional training for Unit nurses in these areas commenced shortly after Ms. Arriaga's directive (*Id.*; Ludwig Aff., ¶16).

In September 2011, Ms. Arriaga met with the SDS nurses and told them that the new rotation would begin going into effect (Arriaga Aff., ¶7).  Some of the plaintiffs expressed religious or moral objections to providing care to TOP patients (*Id.*).  In response, Ms. Arriaga explained that the Hospital did not have adequate nursing staff to cover the TOP patients absent plaintiffs' assistance and that, accordingly, she expected all nurses to provide pre and post-operative care to TOP patients (*Id.*).  However, Ms. Arriaga also told them at that meeting, and many times thereafter, that if they had any objections to caring for TOP patients, they should contact the Office of Workplace Diversity to discuss possible accommodations (*Id.*).  Ms. Arriaga never told plaintiffs that they would be fired if they did not care for TOP patients (*Id.*).

On October 4, 2011, Assistant Nurse Managers Tammy Ludwig and Cynthia Odeh had a staff meeting with the nurses in the Unit (Ludwig Aff., ¶17). Ms. Ludwig and Ms. Odeh informed the nurses of the progress made in training

and told them that the new required rotation would go into effect within a few weeks (*Id.*).  Under the new rotation, each nurse would be assigned to work at the front desk on a rotating basis (*Id.*).  In that capacity, the desk nurse would be responsible for navigating patients – that is, checking them in and directing them to the appropriate nurse and location for treatment (*Id.*).  As part of the new rotation, each nurse also would be responsible for making pre and post-operation telephone calls on a rotating basis (*Id.*).  In that capacity, the nurse was responsible for making pre-op calls to patients to review with the patient pre-operative instructions, and post-operative calls to patients to follow up on their treatment and condition (*Id.*).  As part of the new rotation, each nurse also would be expected to perform chart audits on a rotational basis (*Id.*).  This task involved reviewing charts after the completion of services and compiling statistics concerning patient treatment in the Unit (*Id.*).  As part of the new rotation, each nurse also would be responsible for providing pre and post-operative care to all patients, including TOP patients (*Id.*).

At the October 4th meeting, several nurses objected to the new rotation (Ludwig Aff., ¶18).  Many of the objections had nothing to do with the care of TOP patients (*Id.*).[6]

---

[6] Plaintiffs Danquah and Jose-Mendoza objected to working at the front desk because it purportedly was too stressful (*Id.*).  Plaintiff Taylor objected to checking the Unit refrigerator, and said she could not do that because of her bad back (*Id.*).

The nurses also complained because they would not receive charge pay for the time spent at the front desk (Ludwig Aff., ¶18). Charge pay is provided to the front desk nurse if no supervisor is in the building, because the front desk nurse is in charge of the Unit at that time (*Id.*). The nurses demanded charge pay even if a supervisor was in the building and reachable (*Id.*).

In addition, certain nurses objected at the October 4th meeting and thereafter to providing care to TOP patients on moral and religious grounds (Ludwig Aff., ¶19). In the past, many of these same nurses had provided pre and/or post-operative care to TOP patients without objection (*Id.*).[7] Ms. Arriaga, Ms. Ludwig and Ms. Odeh told the nurses, after hearing their objections, that if they objected to caring for TOP patients, they should contact Hospital administration to seek an

---

Taylor also objected to having to make pre and post-operative calls to Spanish-speaking patients (*Id.*). Taylor reluctantly agreed to perform chart reviews, but said she was not that good on the computer (*Id.*). Plaintiff Ching wanted an accommodation to prevent her from having to make pre and post-operative calls because some of the patients she would be calling did not speak English well (*Id.*). Ching also said that performing chart reviews would be difficult because she lacked computer skills (*Id.*). Plaintiff Mananquil, who worked on the evening shift, objected to the new rotation because the nurses on the early shift purportedly would be too slow and there would be more work left for the evening shift (*Id.*).

[7] Unit records indicate that the following plaintiffs provided routine pre or post-operative care to TOP patients during the period from July 10, 2010 to October 1, 2011, as follows: plaintiff Otieno-Njoge – post, 32 occasions; plaintiff Deseo – post, 16 occasions; plaintiff Linaac – post, 27 occasions; plaintiff Ching – pre, 33 occasions and post, 13 occasions; plaintiff Abad – post, 38 occasions; plaintiff Taylor – post, 1 occasion; plaintiff Habaradas – post, 11 occasions; and plaintiff Vinoya – post, 26 occasions (Ludwig Aff., ¶20). Prior to July 10, 2010, certain plaintiffs provided pre and/or post-operative care to TOP patients on many other occasions (*Id.*).

accommodation (*Id.*).   None of the nurses did this at that time or at any time thereafter (*Id.*).

The nurses requested that Ms. Odeh and Ms. Ludwig meet with them and their Union representative, Ms. Baez, to discuss their concerns with the new rotation (Ludwig Aff., ¶21).  Ms. Arriaga scheduled a meeting for October 14, 2011, and asked that Darnell Reamer of the UMDNJ Labor Relations staff attend. (*Id.*).  Ms. Odeh, Mr. Reamer, and Ms. Ludwig arrived at the meeting room on October 14 (*Id.*).  Ms. Baez also was there (*Id.*).  Two of the nurses arrived with a man they identified as their attorney (*Id.*).  The nurses had not previously advised that they would be bringing their attorney (*Id.*).  The nurses were told that the meeting could not go forward with their attorney there because University counsel was not present (*Id.*).  Ms. Baez asked plaintiffs' attorney to leave the room so that the meeting could forward (*Id.*).  He refused, and the meeting did not go forward (*Id.*).

On October 14, 2011, fifteen of the nurses in the Unit, including all of the plaintiffs, sent a memo to Teresa Rejrat, Chief Nursing Officer (Rejrat Aff., ¶6 and Ex. A).  The memo expressed concerns about "new changes" in the Unit (*Id.*).  The first concern was the Hospital's refusal to pay charge pay to nurses at the front desk (*Id.*).  The next concern expressed religious objections to providing pre-operative care to TOP patients (*Id.*).   Notably, the memo stated "We do not object

13

in [sic] providing post operative care." (*Id.*).  The memo also falsely stated that Ms. Ludwig had harassed them and made statements to them concerning potential termination from employment (*Id.* and Ludwig Aff. at ¶22).   Ms. Ludwig never made those statements (Ludwig Aff. at ¶22).  After receiving the memo, Ms. Rejrat instructed Ms. Arriaga to inform the nurses that if they had religious or moral objections to caring for TOP patients, they should seek an accommodation from the Office of Workplace Diversity (Rejrat Aff., ¶7).

One of the plaintiffs told Ms. Ludwig, referring to care for TOP patients, that she refuses to commit murder in the Unit (Ludwig Aff., ¶23).  In addition, certain of the plaintiffs have emailed and texted Ms. Ludwig that they will pray for her (*Id.*).  They sing religious hymns in the workplace when they see Ms. Ludwig (*Id.*).  They have refused to interact normally and work productively with other nurses in the Unit who do not object to caring for TOP patients (*Id.*).  These activities are offensive and threatening to Ms. Ludwig and others and are very disruptive to the operations of the Unit (*Id.*).

Plaintiffs have indicated that they want to continue in their current positions without performing any care for TOP patients (Ludwig Aff., ¶27).  They want all services with respect to TOP patients assigned to other nurses (*Id.*). Such circumstances are not conducive to effective operations and patient care (*Id.*).  In effect, these objecting nurses will be performing approximately eighty to eighty-

five percent of the duties of their positions while receiving full-time pay (Rejrat Aff., ¶10).  Other non-objecting full-time nurses in the Unit, of whom there are only two, will have to assume the duties rejected by these nurses, or *per diem* nurses will have to be hired from outside the Hospital at increased cost to the Hospital (*Id.*).  It is estimated that it would be necessary to hire *per diem* or staff nurses at a total annual cost of approximately $280,000 to the Hospital to provide the care for TOP patients that plaintiffs refuse to perform (*Id.*).

In addition, if Unit nurses had the right to refuse to perform routine pre and post-operative care for TOP patients, patient care would be adversely affected because objecting nurses would discriminate against these patients based on their status as TOP patients (Rejrat Aff., ¶10; Ludwig Aff., ¶27).  Already, there has been one situation (personally observed by Ms. Ludwig) in which one of the plaintiffs refused, in front of the patient, to provide any care to that patient because she was a TOP patient (Ludwig Aff*.,* ¶27).  The patient was extremely upset and had to be counseled by other members of the nursing staff (*Id.*).

Even if duties were rearranged to ensure objecting nurses did not provide services to TOP patients in the regular course of their duties, there still would be emergency situations during which those nurses would be required to assist TOP patients (Rejrat Aff., ¶11).  On occasion, TOP patients have experienced emergencies in the Unit such as hemorrhaging (Arriaga Aff., ¶9).  Moreover, a

15

TOP patient, like any other patient in the Unit, could experience a health emergency, whether or not related to the termination of the pregnancy, while in pre-operative and/or post-operative care (*Id.*).  It is not always possible to have those emergencies handled by non-objecting nurses, who may be occupied with other patients at the time or may be in other areas (*Id.*).  In such circumstances, the objecting nurse would be expected to assist the patient (Rejrat Aff., ¶11.).  The Hospital expects all nurses to assist patients in need and to take any necessary actions to address emergencies (*Id.*).

The potential for such emergencies is not theoretical, as it actually has occurred on at least two occasions in the last two years (Arriaga Aff., ¶10).  On both of those occasions, a TOP patient was in distress in the pre-operative area (*Id.*).  The nurse on duty, a non-objecting nurse, needed and called for assistance to address the emergency (*Id.*).  The other nurses in the area refused to assist because the patient was a TOP patient (*Id.*).   Fortunately, the treating nurse was able to reach Ms. Arriaga, who happened to be in her office at the time, and was able to rush to the Unit to assist (*Id.*).

The only way plaintiffs can completely avoid the possibility of having to assist with emergency situations involving TOP patients is to transfer out of the SDS Unit.  The possibility of such a transfer was memorialized in letters from Ms. Rejrat to the plaintiffs, dated and sent on November 18, 2011, which read:

You have indicated that you have religious and/or moral objections to performing certain of your current job duties. The University again invites you to discuss with us potential reasonable accommodations of your objections. Such potential accommodations may include changes in duties, changes in scheduling, and/or transfer to another nursing position that does not involve duties that are objectionable to you for religious and/or moral reasons. We welcome your input and thoughts concerning potential reasonable accommodations. Please contact me … immediately to arrange for this discussion which must be held on or before Wednesday, November 23, 2011.

(Rejrat Aff., ¶12 and Ex B). In response, plaintiffs and their attorneys indicated that plaintiffs were unwilling to discuss possible accommodations with the University. On November 19, 2011, plaintiffs' counsel filed an application that sought to enjoin defendants from pursuing such discussions, which application was denied on November 22, 2011. In response to the Court's decision, nine of the twelve plaintiffs have agreed to meet with Hospital administration to discuss accommodations.

## **ARGUMENT**

### **PLAINTIFFS HAVE FAILED TO DEMONSTRATE THEIR ENTITLEMENT TO THE EXTRAORDINARY REMEDY OFA PRELIMINARY INJUNCTION**

"[T]he granting of a preliminary injunction is an exercise of very far-reaching power, never to be indulged in except in a case clearly demanding it." *Warner Bros. Pictures, Inc. v. Gittone*, 110 F.2d 292, 293 (3d Cir. 1940). A

preliminary injunction is an extraordinary remedy which should be used sparingly and only where the proven equities establish a clear need for the injunction.

To obtain preliminary injunctive relief under Rule 65 of the Federal Rules of Civil Procedure and Local Civil Rule 65.1, an applicant must demonstrate: (1) a *substantial* likelihood of success on the merits; (2) it will suffer irreparable harm if an injunction does not issue; (3) the harm it will suffer outweighs the potential harm to the other affected parties if injunctive relief is granted; <u>and</u> (4) an injunction would serve the public interest. *See Shire US Inc., v. Barr Labs. Inc.*, 329 F.3d 348, 352 (3d Cir. 2003); *Instant Air Freight Co. v. C.F. Air Freight Co.*, 882 F.2d 797, 800 (3d Cir. 1989). "An injunction should issue only if [plaintiffs] produce[] evidence sufficient to convince the court that all four factors favor preliminary relief." *American Home Prods. Corp. v. Proctor & Gamble, Co.*, 871 F.Supp. 739, 758 (D.N.J. 1994). Here, such extraordinary relief is inappropriate because plaintiffs cannot demonstrate that any of the above-referenced factors are met.

> **A.     Plaintiffs Cannot Demonstrate a Substantial Likelihood of <u>Success on the Merits.</u>**

Plaintiffs have not asserted recognized viable claims: the Church Amendment does not provide a private right of action, the New Jersey Conscience statute is inapplicable to UMDNJ, and there is no recognized due process liberty interest in continued public employment after refusing to provide any care for TOP

patients.   For these reasons, and those discussed below, plaintiffs cannot demonstrate a substantial likelihood of success on the merits of their claims.

1.   **Church Amendment Claims.**

a) **There is No Private Right of Action Under the Church Amendment.**

Plaintiffs seek to invoke the protections of the federal "Church Amendment" (42 U.S.C. § 300a-7(c)).  However, the Church Amendment does not confer an express or implied private right of action.  *See Cenzon-DeCarlo v. Mount Sinai Hosp.*, 626 F.3d 695, 699 (2nd Cir. 2010) (after careful analysis of the Church Amendment's text and legislative history, the Court of Appeals for the Second Circuit found no evidence that Congress created or intended to create a private right of action); *Anspach v. City of Philadelphia*, 630 F. Supp. 2d 488, 496-97 (E.D. Pa. Oct. 29, 2008) (concluding that Title X of Public Health Service Act, which encompasses the Church Amendment, does not confer an express or implied right of action), *aff'd on other grounds,* 380 Fed. Appx. 180 (3d Cir. 2010); *Nead v. Bd. of Trustees of Eastern Illinois Univ.*, 2006 WL 1582454, *5 (C.D. Ill. June 6, 2006) ("The [Church Amendment] statute does not create an express private right of action and a strong presumption exists against creation of an implied right of action."); *Moncivaiz v. DeKalb County*, 2004 WL 539994, *3 (N.D. Ill. Mar. 12, 2004) (same).  Plaintiffs' brief fails to even mention the above-referenced case

law.[8]

A bill to amend the Church Amendment in order to provide for a private right of action has been passed in the U.S. House of Representatives and currently is pending in the Senate.  Protect Life Act, H.R. 358, 112th Cong. § 2(g)(2011). The House Report relating to this Act confirms that the provision of a private right of action would be an <u>addition</u> to the statute – not a clarification of the existing

---

[8] Plaintiffs cite to two cases that mention the Church Amendment (apparently, although unclear, to support an argument that the statute confers a private right of action).  The first case, *Erzinger v. Regents of Univ. of Cal.,* 137 Cal. App. 3d 389, 394 (1982), only briefly addresses the Church Amendment.  In that case, the plaintiff-students sought to have declared unconstitutional the defendant-university's policy of requiring all students to pay registration fees and allotting a portion of such fees to pay for abortions without a *pro rata* exception for the plaintiffs based on their religious beliefs, as it purportedly interfered with their First Amendment right to exercise their religion.  The Court affirmed the lower court's dismissal of the plaintiffs' complaint.  At the end of its opinion, the Court noted that the plaintiffs raised the issue of the Church Amendment (specifically, Section 300a-7(d)) in their brief, and, without any analysis as to whether the statute conferred a private right of action, the Court held that the statute was inapplicable because the plaintiffs were not involved in the "performance" of abortion procedures.  *Id.* at 394.  The second case to which plaintiffs cite is *Carey v. Maricopa County*, 609 F. Supp. 2d 1132 (D. Ariz. 2009).  It is unclear whether the plaintiff there pursued claims directly under the Church Amendment, as the only federal claims discussed at length in the decision are claims under Title VII and the U.S. Constitution.  The Church Amendment was mentioned in one sentence of the decision only, in which sentence the Court noted that the defendants' summary judgment papers did not dispute the absence of a bar to an award of punitive damages against certain defendants under 42 U.S.C. §300a-7.  Defendants submit that because these cases contain no analysis whatsoever of the language of the Church Amendment or its legislative history, they are not instructive precedent on the issue of whether a private right of action exists under the Church Amendment.

statute.  *See id.* at  52.  Accordingly, to the extent plaintiffs are attempting to assert claims directly under the Church Amendment, they are asking this Court to bypass the legislative process and grant them rights that the Legislature has not.   The Court must decline to do so.   *See Alexander v. Sandoval,* 532 U.S. 275, 286-87 (2001) ("courts may not create [a cause of action], no matter how desirable that might be as a policy matter").

In an apparent attempt to circumvent the fact that they cannot sue defendants directly under the Church Amendment, plaintiffs pursue claims based on the alleged violations of that statute through 42 U.S.C. § 1983 ("Section 1983"). Specifically, relying on the inclusion of the heading "Individual Rights" in the section of the Public Law that was codified as a portion of the Church Amendment at issue here (Section 214(A) of Pub. L. No. 93-348, 88 Stat 342 (1974)), plaintiffs argue that the Church Amendment purportedly confers "individual rights" which may be remedied in federal court through a claim under Section 1983 (Plaintiffs' Brief ("Pb"),  6-7).  The United States Supreme Court has established that:

> Critically, the inquiry whether there is a personal right under implied right of action analysis and the question whether there is a personal 'enforceable right' under Section 1983 are the same.  As the Supreme Court held in *Gonzaga University v. Doe:* . . . 'A court's role in discerning whether personal rights exist in the § 1983 context should therefore not differ from its role in discerning whether personal rights exist in the implied right of action context.'

*Three Rivers Ctr. for Indep. Living v. Hous. Auth. of the City of Pittsburgh*, 382 F.3d 412, 422 (3d Cir. 2004) (quoting *Gonzaga Univ. v. Doe*, 536 U.S. 273, 285-86 (2002)).  Plaintiffs' counsel fails to inform this Court that he addressed arguments relating to the above-referenced "Individual Rights" heading to the Second Circuit Court of Appeals in *Cenzon-DeCarlo v. Mount Sinai Hospital*, 626 F.3d 695 (2nd Cir. 2010).  Significantly, the Court held that the heading clearly did <u>not</u> amount to an explicit conferral of rights, and declined to hold that it amounted to unequivocal evidence of an intent to confer rights.  *Id*. at 697-699.[9]  In *Gonzaga*, *supra*, the Supreme Court made clear that nothing "short of an **unambiguously conferred right** [will] support a cause of action brought under Section 1983."  *Gonzaga* at 283 (emphasis added).  Plaintiffs have pointed to no authority to support the existence of such an unambiguously conferred right under the Church Amendment.

Notably, in *Anspach v. City of Philadelphia*, *supra*, the District Court for the Eastern District of Pennsylvania considered whether Title X of the Public Health Service Act, 42 U.S.C.A. §§ 300-300a-8 -- which encompasses the Church Amendment -- creates individual rights that may be enforced under Section 1983, and concluded that it did not.  630 F.Supp.2d at 496-97.  Specifically, the Court

---

[9]Notably, the Court further held that "there is *no* evidence that Congress intended to create a right *of action*" under the Church Amendment. *Id.* at 698 (italics in original).  Accordingly, the Court affirmed the dismissal of the nurse-plaintiff's claims under the Church Amendment on summary judgment.

concluded that the statute's "tenor and goal" appeared to be the provision of funding for, *inter alia*, the operation of clinics for the benefit of the general public, and did not contain any language from which the Court "could infer that Congress intended to confer any enforceable rights upon any individual member of the public in the event that the statute should somehow be violated." *Id.  See also Planned Parenthood of Central Texas v. Sanchez,* 280 F. Supp. 2d 590 (W.D. Tex. 2003) (applying *Gonzaga* and finding that Title X did not confer individual rights enforceable under Section 1983), *remanded on other grounds*, 403 F.3d 324, 335 (5th Cir. 2005).

Accordingly, plaintiffs cannot sue defendants under the Church Amendment, and cannot use Section 1983 as a vehicle through which to pursue claims predicated on alleged violations of the Church Amendment.  Because the Church Amendment does not confer an express or implied private right of action, this Court has no power to award any relief to plaintiffs under it, including injunctive relief.  *See Cenzon-DeCarlo, supra*, at 699.[10]

---

[10] If this Court confirms that the Church Amendment does not confer an express or implied right of action (and that alleged violations of same cannot be pursued under Section 1983), it will not be leaving plaintiffs without any remedy for the alleged "discrimination" about which they complain.  Pursuant to the Church Amendment implementation and enforcement scheme developed by Department of Health and Human Services regulations, violations of the Amendment should be addressed to and remedied by the Department's Office of Civil Rights.  45 C.F.R. §88.2 (2011).  Also, to the extent plaintiffs contend that providing any type of assistance to a woman who is going to have or has had a TOP procedure infringes

**b)** **Even Assuming *Arguendo* that Plaintiffs Could Pursue Remedies for Alleged Violations of the Church Amendment Directly Under That Statute or Through Section 1983, They Cannot Show a Substantial Likelihood of Success on the Merits of Such Claims Because, *Inter Alia*, They Are Not Required to Assist in the Performance of Abortions.**

Even assuming for the sake of argument that plaintiffs have a private right of action under the Church Amendment (or individual rights under that statute that could be enforced through Section 1983), they cannot demonstrate a substantial likelihood of success on the merits of their claims that defendants have forced them to assist in the performance of abortions and have discriminated against them for refusing to provide such assistance.

The Church Amendment states, in pertinent part:

(c) Discrimination prohibition

**(1)** No entity which receives a grant, contract, loan, or loan guarantee … may—

**(A)** discriminate in the employment, promotion, or termination of employment of any physician or other health care personnel, …

because he performed or assisted in the performance of a lawful sterilization procedure or abortion, because he refused to perform or assist in the performance of such a

on their religious beliefs, that claim is a traditional religious discrimination claim that plaintiffs could pursue under Title VII. The Church Amendment is not intended to replace or circumvent Title VII's protections against *bona fide* religious discrimination, and this court should not permit plaintiffs to so use it.

procedure or abortion on the grounds that his performance or assistance in the performance of the procedure or abortion would be contrary to his religious beliefs or moral convictions, or because of his religious beliefs or moral convictions respecting sterilization procedures or abortions.

**(2)** No entity which receives … a grant or contract for biomedical or behavioral research under any program administered by the Secretary of Health and Human Services may--

**(A)** discriminate in the employment, promotion, or termination of employment of any physician or other health care personnel, …

because he performed or assisted in the performance of any lawful health service or research activity, because he refused to perform or assist in the performance of any such service or activity on the grounds that his performance or assistance in the performance of such service or activity would be contrary to his religious beliefs or moral convictions, or because of his religious beliefs or moral convictions respecting sterilization procedures or abortions.

42 U.S.C. § 300a-7(c).

Plaintiffs contend that defendants have violated, *inter alia*, Section (c)(1) of the statute by forcing them to assist with abortion procedures, and discriminating against them for refusing to assist with abortion procedures (Pb at 5, 9-11). Specifically, plaintiffs claim that they have been threatened with termination and, although unclear, other unspecified "adverse actions" if they refuse to assist in performing abortions (*Id.*, 3-4). Implicit in plaintiffs' contention that they

purportedly have been threatened with adverse actions is the concession that no plaintiff has been terminated, and no other adverse actions actually have been taken to date.  Accordingly, plaintiffs' claims that they have been discriminated against in violation of the Church Amendment (assuming again that the statute afforded a private right of action or that plaintiffs could pursue alleged violations of same through Section 1983) simply are not ripe.  The statute is narrowly drawn and plainly prohibits one thing only – discrimination.  Plaintiffs have not identified any adverse employment actions to which they have been subjected.  Rather, they contend simply that they believe certain alleged statements made to them were, in their view, "threatening."

Moreover, defendants fully comply with the Church Amendment, as they do not require plaintiffs to "assist in the performance" of abortions.  Plaintiffs are not required to enter the operating room where the abortions are performed.  Rather, they simply are expected to administer routine pre and post-operative care to TOP (and other SDS) patients.  While the Church Amendment does not define what the phrase "assist in the performance" of an abortion encompasses, not surprisingly, plaintiffs seek to define the phrase to include this routine pre and post-operative care for TOP patients.[11]  Indeed, in the November 15, 2011 Morris County Edition

---

[11] While plaintiffs, according to their counsel's submissions, now apparently object to providing routine post-operative care for TOP patients, notably, in an October 14, 2011 memorandum they prepared and sent to Teresa Rejrat, the VP of Patient

of "The Star Ledger," one of plaintiffs' attorneys was quoted as stating that plaintiffs would be "helping to make [an abortion] happen" even if they were required to do nothing more than routine tasks such as taking down a TOP patient's name or helping to walk her to the door.  Seth Augenstein, *Nurses' abortion suit asks: At what point is assisting facilitating?,* THE STAR LEDGER, Nov. 15, 2011, at 25.  Plaintiffs have not cited to any legal authority whatsoever that supports such a broad reading of "assist in the performance" an abortion.

Significantly, a 2008 regulation passed by President George W. Bush's administration that provided a broad interpretation of that phrase encompassing such activities as "counseling, referral, training, and other arrangements for the procedure" (Ensuring That Department of Health and Human Services Funds Do Not Support Coercive or Discriminatory Policies or Practices in Violation of Federal Law, 73 Fed. Reg. 78072, 78097 (Dec. 19, 2008) (formerly codified at 45 C.F.R. § 88.1, *et seq.*)), was rescinded earlier this year by President Barak Obama's administration.[12]  The Obama administration has declined to provide a

---

Care Services/Chief Nursing Officer, they stated that with respect to TOP patients, "We do not object in providing post operative care …."  (Rejrat Aff., Ex A).

[12] President Obama's administration so acted in response to public comments that the Bush regulation's interpretation of the statute was far too broad, as it encompassed healthcare procedures with only a tenuous connection to the performance of an abortion, and because health care providers have an obligation to assist patients to receive health care services regardless of the providers' conscientious objections.  Regulation for the Enforcement of Federal Health Care

new definition, thereby restoring an interpretation that complies with the plain meaning of the phrase.  Regulation for the Enforcement of Federal Health Care Provider Conscience Protection Laws, 76 Fed. Reg. at 9973-74.

The broad definition of "assist in the performance" that plaintiffs advocate in this case would stifle UMDNJ's medical operations and ability to provide adequate patient care.  Defendants submit that the Church Amendment clearly was not intended to protect medical personnel from boycotting the provision of routine pre and post-operative care to patients who are undergoing lawful medical procedures. The Church Amendment is not an anti-abortion statute; indeed, just as the statute protects health care personnel who refuse to assist in the performance of abortions, it also protects health care personnel who choose to assist in the performance of abortions.  Defendants further submit that in determining the plain meaning of the phrase "assist in the performance" of an abortion, the word "performance" cannot be ignored.  The statute does not protect objectors from having to provide assistance to TOP patients at any time during their stay in the hospital – rather, its

---

Provider Conscience Protection Laws, 76 Fed. Reg. 9968-02, 9972-74 (Feb 23, 2011).

plain language only forbids discrimination against them if they refuse to assist when the abortion (*i.e.*, the actual surgical procedure) is being "performed."[13]

Plaintiffs cannot be allowed to refuse routine pre and post- operative care to patients simply due to those patients' status as TOP patients.  *See* Regulation for the Enforcement of Federal Health Care Provider Conscience Protection Laws, 76 Fed. Reg. at 9973 ("the Department partially rescinds the 2008 Final Rule based on concerns expressed that it had the potential to negatively impact patient access to contraception and certain other medical services without a basis in federal conscience protection statutes").  On at least one occasion of which the Hospital is aware, one of the plaintiffs refused, **in front of the TOP patient**, to provide any care to her because of her status as a TOP patient (Ludwig Aff, ¶27).  Moreover**,** plaintiffs obviously do not refuse to perform such routine pre and post-operative care for SDS patients who have undergone other surgeries, and, in fact, they routinely provide such care to other patients.   Accordingly, there can be no doubt that plaintiffs are objecting to particular patients as opposed to pre and post-

---

[13] *See also* Ronald A. Lindsay, *When to Grant Conscientious Objector Status,* 7:6 Am. J. of Bioethics 25, 26 (2007) ("To extend conscientious objector status to healthcare workers beyond assisting in the actual performance is a 'fundamental misunderstanding about personal responsibility.'") (emphasis added); Rohit Talwar, *The Dangers of Broad Federal Conscience Law*, 6 Health Law. 23 (2009) ("The problem with [a] broad definition is that it may encompass any employee with even an indirect link to abortions and sterilizations and are not responsible for a patient's decision to procure the procedure . . . . Where employees are not responsible for the decisions of a patient they should not be allowed to obstruct these same decisions.").

operative procedures; this conduct clearly falls outside the protection of the Church Amendment.

Plaintiffs further argue that the above-quoted Section (c)(2) of the statute is broader than Section (c)(1), in that it purportedly gives plaintiffs "the right not to assist any health care service contrary to their beliefs" including, again, routine tasks such as filling out patient charts (Pb, 11).[14]   Even assuming *arguendo* that Section (c)(2) could be read that broadly (and plaintiffs have cited no authority to support an argument that it can), to invoke its protection, an employee clearly would have to object to the provision of routine pre and post-operative services on moral and/or religious grounds.   Again, plaintiffs do not refuse to perform such routine care for SDS patients who have undergone other surgeries.  Moreover, as noted above, prior to October 1, 2011, plaintiffs provided this care to TOP patients on numerous occasions without objection (Ludwig Aff., ¶20).  Accordingly, it cannot reasonably be argued that they now object to the provision of such routine pre and post-operative care on moral and/or religious grounds.  Rather, they simply object to the TOP patients. Therefore, they cannot invoke Section (c)(2) to demand relief from the provision of such routine care.

---

[14] Congress specifically addressed assistance in the performance of abortions in Section (c)(1).   Accordingly, Section (c)(2) cannot reasonably be read to broaden the definition of what constitutes assistance in the performance of abortions.

Finally, as previously noted, far from forcing nurses to assist with terminations of pregnancies or other procedures, UMDNJ always has been willing to reasonably accommodate nurses' moral or religious objections to certain of their duties. When the nurses first began voicing their objections relating to pre and post-operative care for TOP patients, they were encouraged to discuss possible accommodations. However, they failed to do so.

Plaintiffs also apparently seek relief from having to provide non-routine care to TOP patients in the event of an emergency. The Church Amendment does not explicitly carve out an exception for emergency care. However, it is not reasonable to assume – as plaintiffs apparently do – that the Church Amendment was intended to elevate these nurses' right to avoid the discomfort they may experience if required to assist a TOP patient in an emergency above the Hospital's obligation to provide emergency medical care (and the patient's right to receive such care). In *California v. United States*, 2008 WL 744840 (N.D. Cal, Mar. 18, 2008), the federal district court for the Northern District of California addressed the interplay between (1) the Emergency Medical Treatment and Assisted Labor Act ("EMTALA"), 42 U.S.C. § 1395dd, which requires hospitals to treat and stabilize (or to transfer to another medical facility) patients presenting with emergency medical conditions, and (2) the Weldon Amendment, Pub. L. No. 108-447, § 508(d), 118 Stat. 2809 (2004), which prohibits federal funds from being

made available to any state government that "subjects an institutional or individual health care entity to discrimination on the basis that the health care entity does not provide, pay for, provide coverage of, or refer for abortions."  The Weldon Amendment, like the Church Amendment, is silent as to whether its provisions apply in situations involving medical emergencies.  Notably, the Court stated that "[t]here is no clear indication, either from the express language of the Weldon Amendment or from a federal official or agency, that enforcing … the EMTALA to require medical treatment for emergency medical conditions would be considered 'discrimination' under the Weldon Amendment if the required medical treatment was abortion-related services." 2008 WL 74480, at *4.  The Court reasoned that "to the extent that statutes can be harmonized, they should be" and that "Congress must be presumed to have known of its former legislation and to have passed new laws in view of the provisions of the legislation already en-acted." *Id.*  (internal quotes and citation omitted).  Here, a reasonable interpretation of the Church Amendment similarly requires that its provisions be harmonized with hospitals' obligation to provide emergency care.

In *Shelton v. University of Medicine & Dentistry of New Jersey*, 223 F.3d 220 (3d Cir. 2000), a Title VII case addressing a UMDNJ nurse's religious objection to assisting with procedures that would result in the termination of a pregnancy (even under circumstances in which the mother's life is in danger), the

Third Circuit Court of Appeals suggested that given a public hospital's obligation to provide emergency treatment, it should not be required to accommodate an employee who refuses to provide emergency treatment to certain patients by accepting the employee's refusal and allowing the employee to remain employed in a unit where such emergency treatment is necessary:

> It would seem unremarkable that public protectors such as police and firefighters must be neutral in providing their services. We would include public health care providers among such public protectors. Although we do not interpret Title VII to require a presumption of undue burden, we believe public trust and confidence requires that a public hospital's health care practitioners – with professional and ethical obligations to care for the sick and injured – will provide treatment in time of emergency.

*Id.* at 228.[15]

By letters dated November 18, 2011, UMDNJ invited plaintiffs to meet and discuss potential accommodations of their moral and/or religious objections. Now

---

[15] The above-referenced case law is consistent with the American Nurses Association's ("ANA") view on the balance between a nurse's right to object to participate in a particular case on ethical grounds and a patient's right to receive emergency care. In a position statement relating to "Reproductive Health" that was reaffirmed by the ANA in March 2010 (and is available on the ANA's public website), it stated:

> Just as the client has rights, the nurse also has rights, including the right to refuse to participate in a particular case on ethical grounds. However, if the nurse becomes involved in such a case and the client's life is in jeopardy, the nurse is obliged to provide for the client's safety, to avoid abandonment, and to withdraw only when assured that alternative sources of nursing care are available to the client.

that plaintiffs have alleged that they are being discriminated against for voicing religious objections to the performance of certain duties, Title VII, which protects against religious discrimination, requires that UNDMJ engage plaintiffs in an interactive process to explore reasonable accommodations of their objections. *See Shelton,* 223 F.3d at 224-25.  Recognizing that remaining in SDS may not be agreeable to plaintiffs (because even if they were removed from all routine pre and post-operative duties associated with the care of TOP patients, they still would be required to assist, if necessary, in providing care to TOP patients in the event of an emergency whether or not the emergency results from a termination of pregnancy procedure), the letter indicated that transfers to other nursing positions could be discussed as a potential accommodation.  Again, plaintiffs initially refused to meet and discuss possible transfers or other reasonable accommodations.

Notably, in *Shelton,* the Court held that UMDNJ's offer to: move the plaintiff-nurse out of the Labor and Delivery unit to a lateral position in the Newborn ICU unit and/or discuss with the plaintiff available nursing positions in other units were reasonable accommodations of her religious beliefs under Title VII.  *Id.* at 226-28.  The Court also held that the plaintiff's unwillingness to explore alternative nursing positions was unjustified.  *Id.* at 228.  Plaintiffs here should not be awarded the extraordinary remedy of a preliminary injunction if they

refuse to even consider comparable positions in other Units of the Hospital or other accommodations.[16]

For all these reasons, plaintiffs cannot demonstrate a substantial likelihood of success on the merits of their Church Amendment claims.

### 2.   Constitutional Claims.

Plaintiffs allege in the Second Cause of Action that defendants have violated their alleged constitutional right "not to be required to assist in abortions."  No court has ever recognized such a right, and, as discussed in detail below, there is absolutely no basis for the creation of such a right.  Plaintiffs are asking the court to create a new constitutional right that would, in effect, constitutionalize the anti-abortion provisions of the Church Amendment and thereby provide plaintiffs with

---

[16] Plaintiffs' argument that the Church Amendment gives them an absolute right to refuse to provide any care to TOP patients -- even in cases of emergency – seeks to give plaintiffs greater protection under the First Amendment's Free Exercise Clause than that Clause gives to plaintiffs as clarified through the U.S. Supreme Court's decision in *Employment Division, Department of Human Resources of Oregon v. Smith*, 494 U.S. 872, 879 (1990).  In *Smith*, the Court explained that "the right of free exercise does not relieve an individual of the obligation to comply with a 'valid and neutral law of general applicability[.]'" (quoting *United States v. Lee*, 455 U.S. 252, 263 (n.3) (1982)).  If plaintiffs' position (*i.e.*, that, in contravention of the restrictions the U.S. Supreme Court has placed on rights under the Free Exercise Clause, Congress intended the Church Amendment to allow religious objectors to ignore facially neutral, generally applicable laws and nursing standards) is correct, then the Church Amendment should be invalidated. *See City of Boerne v. Flores*, 521 U.S. 507 (1997) (invalidating the Religious Freedom Restoration Act's provisions applying to state governments because Congress' enactment of same inappropriately altered the meaning of the Free Exercise Clause).

the private right of action that, as shown *infra*, does not exist under the statutory scheme.

> **a.   The Court Should Not Address the Constitutional Claim Because Plaintiffs Have Failed to Pursue Available Procedures That Would Avoid Any Alleged Deprivation of Constitutional Rights.**

The court need not and should not reach the constitutional issue.  It is well-established that plaintiffs seeking to establish or vindicate a Due Process right must demonstrate that they have pursued all available procedures that could avoid the constitutional deprivation. *See Alvin v. Suzuki*, 227 F.3d 107, 116 (3d Cir. 2000); *Acevedo v. City of Philadelphia*, 680 F. Supp. 2d 716, 747 (E.D. Pa. 2010). Similarly, courts should always avoid addressing a constitutional issue if there are other alternative means of resolving the matter or the matter is not ripe for decision.  *See Mills v. Rogers*, 457 U.S. 291, 305 (1982); *Armstrong World Industries, Inc. v. Adams*,   961 F.2d 405, 413 (3d Cir. 1992).  *See also New Jersey Payphone Assoc. v. Town of West New York*, 299 F.3d 235, 249 (3d Cir. 2002) (Alito, J., concurring).

There are such means available here. As discussed, the Hospital has offered and continues to offer reasonable accommodations to plaintiffs.  Thus, plaintiffs should be required to discuss with the Hospital whether there are reasonable accommodations to their existing duties that would meet their religious or moral objections and permit them to remain in their current positions, or whether, if they

truly object to providing <u>any</u> <u>care</u> <u>whatsoever</u> for TOP patients including routine pre and post-operative care and care in emergency situations, there are possibilities for transfer to other nursing positions at the Hospital that do not involve TOP patients.   At present there are approximately 24 nursing vacancies available involving positions that do not provide any care for TOP patients (Rejrat Aff., ¶12).

In sum, there has not to date been any deprivation of the alleged constitutional right, and it is highly likely that such alleged deprivation will be avoided altogether by an accommodation.  Thus, the constitutional issue is <u>not</u> ripe for review and, therefore, the Court should not address the issue now.[17]

### b.    Plaintiffs' Constitutional Claims are Deficient As a Matter of Law.

If the constitutional claim is considered, it must be rejected.  Plaintiffs allege that Defendants have violated their alleged constitutional right  "not to be required to assist abortions," and assert that "The right to liberty under the Fourteenth Amendment includes the right not to be required to assist abortions as a condition of maintaining government employment free of discrimination." (Complaint, ¶93).

---

[17] The need for deferral on this issue is even greater now, because nine of the plaintiffs agreed, just today, to meet with Hospital administration to discuss accommodations.   Previously, all plaintiffs and their attorneys had vehemently opposed discussing any accommodations.

There is no such constitutional right and, therefore, plaintiffs do not have a substantial likelihood of success on the merits on this claim.

The Supreme Court, on very rare occasions, has recognized the existence of certain substantive fundamental liberty interests protected from government interference by the Due Process Clause.   Thus, the "liberty" protected by the Clause as a matter of substantive due process includes the right to marry; to have children; to procreate; to marital privacy; to use contraception; to bodily integrity; and to abortion. *Washington v. Glucksberg*,  521 U.S. 702 (1997). The Court has granted protections to such rights because "they involve the most intimate and personal choices a person may make in a lifetime, choices central to personal dignity and autonomy."  *Planned Parenthood of Pennsylvania v. Casey*, 505 U.S. 833, 851 (1992).

These fundamental rights are not found in the text of the Constitution and, for that reason, the Court has strongly cautioned against expanding the substantive rights protected by the Clause because "guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended.  *Collins v. Harker Heights*, 503 U.S. 115, 125 (1992).  In *Washington v. Glucksberg, supra*, the Court refused to find a fundamental liberty interest in assisted suicide.  It noted, "By extending constitutional protection to an asserted right or liberty interest, we, to a great extent, place the matter outside the arena of public debate and legislative action."

521 U.S. at 720.  It cautioned that lower courts should "exercise the utmost care whenever we are asked to break new ground in this field, lest the liberty protected by the Due Process Clause be subtly transformed in the policy preferences of the court."  *Id.*

To guard against the improper and unwarranted recognition of new liberty interests, the Court has established a rigorous test.  First, the proposed fundamental liberty must "be objectively, deeply rooted in this Nation's history and tradition and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed."  Second, there must be a careful narrowly-drawn description of the asserted fundamental liberty interest. *Id*. at 720-21.

This test is rarely satisfied. *See, e.g., Schmidt v. Des Moines Public Schools*, 655 F.3d 811 (8th Cir. 2011)(No fundamental liberty interest in contacting children at school); *Abigail Alliance for Better Access to Developmental Drugs v. Eschenbach*, 495 F.3d 695 (D.C. Cir. 2007)(No fundamental liberty interest in access to investigational drugs); *McCurdy v. Dodd*, 352 F.3d 820 (3d Cir. 2003)(No fundamental liberty interest in companionship of adult child).

Plaintiffs' claims in this matter fail the test.  The asserted fundamental liberty interest – the right not to be required to assist abortions as a condition of maintaining public employment without discrimination – is not at all deeply rooted in the Nation's history and tradition implicit in the concept of ordered liberty, such

that neither liberty nor justice would cease to exist if it were sacrificed.  Plaintiffs'
claims do not involve government interference with traditionally intimate personal
decisions relating to personal privacy and autonomy such as marriage, child
rearing, and abortion.  Rather, they are based on an alleged fundamental right to
guaranteed public employment. They involve essentially a workplace dispute
concerning the performance of certain routine job duties relating to TOP patients
(*e.g.*, reading charts, monitoring vital signs, ensuring the patient has a ride home).
Plaintiffs seek recognition of a fundamental right, protected by substantive due
process, that guarantees them continued public employment without being required
to perform such duties.[18]

    Contrary to plaintiffs' arguments the relevant constitutional inquiry is **not**
whether there were or are laws forbidding prosecution or discrimination against
those who refuse to participate in abortions, but whether there is a well-established

---

[18] In reality, plaintiffs' liberty interest claim is nothing more than a feeble attempt
to evade the numerous First Amendment decisions denying public employees
rights similar to those claimed by plaintiffs here. *See, e.g., Garcetti v. Ceballos*,
547 U.S. 410 (2006).  Plaintiffs seek a constitutional right not to be compelled to
provide routine nursing care to certain patients because plaintiffs' religious or
moral beliefs conflict with the identity of the patient or the patient's beliefs.  There
are strong reasons why such rights have been denied under the First Amendment
and should be denied in this case as well.  Recognition of such a right would open
the door to limitless refusals to work because a nurse had religious or moral
objections to the patient or the patient's beliefs.  There would be a great potential
for discrimination against entire categories of patients who do not hold the same
religious or moral beliefs as the objector or who are seeking care to which the
objector has religious or moral objections.

history and tradition implicit in the concept of ordered liberty guaranteeing continued public employment to employees who refuse to perform any services for abortion patients.   There is, of course, no such history or tradition and, in fact, history reveals just the opposite – that public employment is not guaranteed to anyone by substantive due process. [19]

_____

[19]The arguments contained in plaintiffs' brief are without merit.  The reliance on pre-*Roe v. Wade*, 400 U.S. 113 (1973) protection laws and modern conscience statutes, even if it were relevant, is unpersuasive.   The pre-*Roe* statutes were enacted at a time when abortion was, for the most part, illegal.   Thus, whatever history or tradition they might support was obliterated by the decision in *Roe* because abortion is no longer a crime but a constitutionally-protected right.   The modern conscience statutes do not, in any way, create a fundamental constitutional right to refuse to participate in abortions.   To begin, they are too new to establish they were "deeply rooted" in the history of the Nation.   Moreover, some of them contain exceptions that require objectors to treat abortion patients in emergency situations. Thus, it is clear that the touted right to refuse and its parameters are still very much a matter in "the arena of public debate and legislative action."   It should not be removed from that arena by judicial fiat.   *See Washington v. Glucksberg, supra.*   Similarly, the Supreme Court's passing references to conscience statutes and AMA guidelines in the very decisions recognizing and reaffirming a woman's right to an abortion do not support plaintiffs' constitutional claims. The Court has never even come close to addressing the issue of whether health care professionals have a substantive due process right to refuse to provide care to abortion patients.   Plaintiffs' selective reliance on *Roe* is misplaced in any event.   Just because a woman has a fundamental liberty interest in obtaining an abortion does not mean that a health care provider has a fundamental liberty interest to refuse to provide any care for abortion patients.   The courts have uniformly refused to create fundamental liberty interests even though the proposed new interest relates in some way to an existing fundamental liberty interest.   *See, e.g., Washington v. Glucksberg, supra*, (Fundamental right to refuse medical treatment not extended to create fundamental right to assisted suicide); *McCurdy v. Dodd, supra* (Fundamental right to raise child not extended to create fundamental right to companionship of adult child).   Finally, plaintiffs' reliance on *Roe* is seemingly quite ironic, since the fundamental right they seek – the absolute right to refuse to

41

The Third Circuit and other courts have recognized this fact and have consistently held that there is no substantive due process right to public employment.  In *Nicholas v. Pennsylvania State University*, 227 F.3d 133 (3d Cir. 2000), the Third Circuit held that public employment "bears little resemblance" to other fundamental rights such as personal choice in matters of marriage and family and, therefore, is "unworthy" of substantive due process protection.  The court further noted that the right to continued public employment "does not approach" the interests implicit in the concept of ordered liberty.  *Id.* at 143.  *See Singleton v. Cecil*, 176 F.3d 419, 425 (8th Cir. 1999) (Extensive discussion with approval of cases rejecting claims of  substantive due process right to continued public employment and noting that freedom of public employees to seek employment elsewhere defeats argument that fundamental liberty has been denied). *See also, McGovern v. City of Jersey City*, 2006 WL 42236 (D.N.J. 2006) (Linares, J.) (Relying on *Nicholas* to reject substantive due process claims of public employee). Since plaintiffs clearly do not have a fundamental substantive due process liberty

---

provide any care to an abortion patient even in cases of emergency – could directly diminish and perhaps even result in the denial of a woman's constitutional right to have an abortion as guaranteed by *Roe*.  However, this is not surprising, since the ADF's stated mission, as posted on its public website, is to defeat the constitutional right to an abortion that was "fabricated" in *Roe*.  The ADF's public website further states, "[i]t took years of calculated lawsuits by the proponents of a culture of death before *Roe v. Wade* was won, and it may take years of fighting back until this ungodly precedent is overruled."

interest in continued public employment – and that is exactly what they are seeking as indicated in paragraph 93 of the Verified Complaint - there is no likelihood of success on the merits of their constitutional claims.[20]

### 3.   New Jersey Conscience Statute Claims.[21]

Plaintiffs also assert a claim under *N.J.S.A.* § 2A:65A-1 (the New Jersey Conscience statute).   That statute provides: "No person shall be required to perform or assist in the performance of an abortion or sterilization."   *N.J.S.A.* § 2A:65A-1.

---

[20]The expectations that plaintiffs provide pre and post-operative care to TOP patients clearly have a rational basis – namely, fulfillment of the Hospital's duty to furnish safe and effective medical care to all patients.  Although the Court need not reach the issue, it is noteworthy that plaintiffs have also failed to provide the required "careful description" of the asserted fundamental liberty interest. Plaintiffs' vague and contorted description does not specify how and in what form the public employment must be continued; nor does it define "assistance" in an abortion.  Plaintiffs' definition of "assistance" is far from narrow.  It apparently extends to any contact whatsoever relating to an abortion patient, whether it be greeting them at the door, reading their charts, or making a post-discharge telephone call to check on their condition.  A liberty interest cannot be so ill-defined.  Finally, it is also worth noting that even if the constitutional right demanded by plaintiffs existed -- and it does not -- there is still not a likelihood of success on the merits in this case because (1) as demonstrated, plaintiffs have not been required to assist in abortions, but only to provide pre and post-operative care to TOP patients similar to the care they provide to other surgical patients and (2) the compelling state interest in providing legal abortion services to patients would override any right of plaintiffs to refuse to perform their routine job duties with respect to TOP patients.

[21]  As a preliminary matter, because all of plaintiffs' federal claims must be dismissed, this Court need not address plaintiffs' state law claim, and may decline to exercise supplemental jurisdiction over it.  28 U.S.C. §1367(c).

Plaintiffs will not succeed on the merits of their claim under the New Jersey Conscience statute because the statute does not apply to public hospitals like University Hospital, and because defendants do not require plaintiffs to assist with abortions.

Plaintiffs have cited to no authority whatsoever to support their assertion that the Conscience statute applies to UMDNJ.  In fact, the New Jersey Supreme Court has ruled that the statute does not apply to private, non-sectarian, non-profit hospitals which receive funding from the federal and state governments and the public because they operate as quasi-public institutions that are required to permit their facilities to be used for elective abortions during first trimester of pregnancy. *Doe v. Bridgeton Hospital Ass'n, Inc.*, 71 N.J. 478, 490-91 (1976).  As University Hospital is a public hospital and is required to allow its facilities to be used for elective abortions, in light of the *Doe* decision, the Conscience Statute clearly does not apply to it.  In *Shelton*, *supra,* the Third Circuit Court of Appeals declined to address the plaintiff-nurse's claim against UMDNJ under the New Jersey Conscience statute, stating that it "note[d], but [did] not reach, the broader issue of whether the statute applied to the Hospital in view of the New Jersey Supreme Court's decision in *Doe* []."  223 F.3d 220, 229 n.11 (3d Cir. 2000).  This Court should follow the Court's reasoning in *Doe* (which, not surprisingly, plaintiffs' papers fail to even acknowledge), and hold that the Conscience statute does not

apply to public hospitals such as University Hospital.

Even assuming *arguendo* that the Conscience statute applies to UMDNJ, plaintiffs still cannot demonstrate a substantial likelihood of success on the merits of their claims under the statute because defendants do not engage in the conduct prohibited by the statute; that is, as discussed at length above in Point A(1)b, defendants do not require plaintiffs to perform or assist in the performance of abortions.[22]

For all these reasons, plaintiffs cannot demonstrate a substantial likelihood of success on the merits of their Conscience statute claims.

### B.     Plaintiffs Cannot Demonstrate That They Will Suffer Irreparable Harm if Their Request for A Preliminary Injunction is Denied.

Plaintiffs' request for a preliminary injunction must be denied for the additional reason that they cannot demonstrate they will suffer irreparable harm if their request is denied.   In their brief, plaintiffs contend that they will be irreparably harmed because, absent an injunction, "they will [be] forced to endure the extreme trauma of assisting abortions which they believe are the killing of innocent babies, or face termination" (Pb, 16).

---

[22] Moreover, for the same reasons discussed *supra* in Point A(1)b, it would not be reasonable to read the New Jersey Conscience statute to allow plaintiffs to refuse to provide TOP patients with routine pre and post-operative care or care in the event of a medical emergency.

Again, plaintiffs have failed to date to engage in an interactive process with UMDNJ -- which is required by Title VII -- in order to explore reasonable accommodations to their religious and/or moral objections, including potential transfer options.  If plaintiffs would consider transferring to another department where they could avoid <u>any</u> interaction whatsoever with TOP patients, the possibility of <u>any</u> harm to plaintiffs, let alone irreparable harm, may be eliminated. Plaintiffs should not be awarded the extraordinary remedy of a preliminary injunction when the purported harm they allege they will suffer could be avoided through other reasonable means.

In addition, plaintiffs' assertion that absent an injunction, they will be forced to assist in the performance of abortions under the threat of termination is nothing more than inflammatory rhetoric.  Again, plaintiffs are not required to assist in the performance of abortions – they do not even have to enter the operating room where the terminations of pregnancy procedures are performed.  Nor have they been threatened with the termination of their employment if they refuse to assist with terminations of pregnancies.  Rather, plaintiffs are expected to provide routine pre and post-operative care to all patients, including TOP patients (as they did without objection prior to October 2011).  It is unreasonable to suggest or assume that plaintiffs now will suffer emotional distress rising to the level of irreparable harm if they are forced to, for example, fill out a TOP patient's records or help to

walk a TOP patient to the door (tasks which, as noted above, plaintiffs' attorney has characterized as assisting in the performance of abortions), for the simple reason that plaintiffs engage in such routine conduct for other SDS patients on a daily basis, presumably without experiencing any emotional distress or anxiety.

As noted above, plaintiffs would be expected to assist TOP patients with non-routine care in the event of an emergency (*i.e.*, when a woman's life is in danger).  It is possible that if an emergency occurs in the future, plaintiffs' assistance would be necessary (unless, of course, plaintiffs transfer to another department).  However, even assuming that such assistance would cause the plaintiffs some emotional distress, the risk that such an emergency will occur and that no medical professionals other than plaintiffs are available to cover the emergency is too speculative to support the imposition of preliminary injunctive relief.  It is axiomatic that "[e]stablishing a risk of irreparable harm is not enough. A plaintiff has the burden of providing a 'clear showing of immediate irreparable injury.'"  *ECRI v. McGraw-Hill, Inc.*, 809 F.2d 223, 226 (3d Cir. 1987) (quoting *Cont'l Group, Inc. v. Amoco Chem. Corp.*, 614 F.2d 351, 359 (3d Cir. 1980)).

For these reasons, plaintiffs cannot meet their burden of demonstrating that they will suffer irreparable harm if an injunction is not issued.

### C.   Plaintiffs Cannot Demonstrate That the Balance of Hardships Weighs in Their Favor.

Plaintiffs do not have to suffer any hardship if their motion for a preliminary injunction is denied; again, they can explore potential accommodations with UMDNJ that would allow them to avoid having to perform any duties associated with TOP patients.   Until today, plaintiffs refused to have such accommodation discussions; if, going forward, they refuse to accept reasonable accommodations, any hardship they suffer will be self-induced, and cannot fairly be said to result from a denial of a preliminary injunction.

On the other hand, University Hospital will suffer significant hardship if an injunction is granted.  As previously noted, if plaintiffs are allowed to continue in their current positions without performing any care for TOP patients (while receiving full-time pay), other non-objecting full-time nurses in the Unit, of whom there are only two, will have to assume the duties rejected by plaintiffs, or *per diem* or staff nurses will have to be hired from outside the Hospital at increased cost to the Hospital of approximately $280,000 per year (Rejrat Aff, ¶10).  In the current economy, incurring such an unnecessary expense (that could be avoided if plaintiffs were willing to transfer to open positions outside the SDS Unit) would be devastating to the Hospital.

**D.     Plaintiffs Cannot Demonstrate That an Injunction Would Serve the Public Interest.**

Plaintiffs cannot demonstrate that the injunction they seek would benefit the public.  In fact, the issuance of the injunction plaintiffs seek would harm the public interest, because patient safety would be compromised.  Again, plaintiffs seek to remain in their current positions without having to provide any care whatsoever to TOP patients, including emergency care.  There undoubtedly are TOP patients who go to University Hospital for termination of pregnancy procedures who cannot afford to go to private hospitals for such services.  If there is any risk at all that University Hospital cannot ensure these patients will have a nurse present who is willing to provide them with care – especially in the event of an emergency – then the patients' ability to receive termination of pregnancy services will be significantly undermined.  Indeed, the issuance of the injunction plaintiffs seek would place a "substantial obstacle" in the path of women seeking safe termination of pregnancy procedures at University Hospital, and thus would constitute an invalid legal restriction under *Planned Parenthood of Pennsylvania v. Casey. See id., supra, at 877* (adopting an undue burden standard for scrutinizing termination of pregnancy regulations and stating that an undue burden is one having "the purpose or effect of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus.")

## **<u>CONCLUSION</u>**

For all the foregoing reasons, Defendants University of Medicine and Dentistry of New Jersey, the Board of Trustees of UMDNJ, James Gonzalez, Suzanne Atkin, Michael Jaker, Patricia Murphy, Theresa Rejrat, Phyllis Liptack, Magale Arriaga and Tammy Ludwig respectfully submit that Plaintiffs' request for a preliminary injunction must be denied.

Respectfully submitted,

McELROY, DEUTSCH, MULVANEY
&  CARPENTER, LLP


By:    <u>    s/ Edward B. Deutsch    </u>
             EDWARD B. DEUTSCH
             A Member of the Firm

Dated:  November 22, 2011